**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DANA MILLER,** | * | |
| **Plaintiff,** | * | |
| v. | * | **Civ. No. DLB-22-3378** |
| **BILL NELSON, ADMINISTRATOR NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,** | * | |
| | * | |
| **Defendant.** | * | |

**<u>MEMORANDUM OPINION</u>**

Dana Miller, a white man in his sixties, worked as a library systems administrator at the National Aeronautics and Space Administration ("NASA") Goddard Space Flight Center for over a decade. Then, in February 2020, NASA fired him. Miller sued, claiming NASA terminated his employment because of his race and sex, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and because of his age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* ECF 9. He also claims he was subjected to a hostile work environment for these same reasons, in violation of both statutes. *Id.* The defendant, Bill Nelson, the Administrator of NASA, has filed a motion to dismiss or, alternatively, for summary judgment. ECF 12. The motion is fully briefed. ECF 12-1, 15, 17. A hearing is not necessary. *See* Loc. R. 105.6. For the following reasons, the motion to dismiss is granted.[1]

---

[1] Miller also filed a motion under Federal Rule of Civil Procedure 56(d) for discovery to oppose summary judgment. ECF 16. This motion is fully briefed too. ECF 16, 18, 19. Because the Court grants the motion to dismiss, the Court denies ECF 16 as moot.

## I.  Background

Miller is approximately 60 years old. ECF 9, ¶ 5. He is a white man. *Id.* Before he was fired, Miller was a contractor employed by Library Associates, LLC d/b/a LAC Group ("LAC"), a Delaware limited liability company, to provide library and information services to NASA.[2] *Id.* ¶¶ 9–10. Miller began working at NASA Goddard in 2009 and had an uninterrupted stretch of service there until his termination in 2020. *Id.* ¶¶ 29–30. In his role as a systems administrator, Miller routinely interacted with other NASA employees. *Id.* ¶ 49. Prior to 2018, Miller received "excellent performance reviews" and consistently exceeded the performance expectations of his superiors. *Id.* ¶¶ 46–48. For much of his time at NASA, Miller enjoyed a positive working relationship with many of his peers and colleagues. *Id.* ¶¶ 47, 50. As part of his responsibilities, Miller would assist NASA employees with "computer matters," which required him to be in their cubicles and in close confines. *Id.* ¶¶ 64–65.

Miller's relationship with his co-workers took a turn for the worse when two younger women were hired at the NASA library in late 2017 and early 2018. *Id.* ¶¶ 51–52, 66. The two women, Jessica Deibert[3] and Christine Lane, are both white and were at all relevant times in their twenties. *Id.* ¶¶ 49–53. Deibert and Lane became friends and "bonded" with their team lead, Holly McIntyre, who was in her thirties and is also a white woman. *Id.* ¶¶ 53–55. Before Deibert and Lane were hired, Miller enjoyed a positive relationship with McIntyre, with whom he interacted regularly in and outside the office. *Id.* ¶¶ 56–61. After Deibert and Lane joined the office, however, the three women formed a "clique," and they routinely "huddled" in each other's cubicles and

---

[2] Nelson does not challenge Miller's allegation that LAC and NASA were joint employers but reserves his right to do so later. ECF 12-1, at 6 n.3. The Court assumes, without deciding, that LAC and NASA were joint employers for purposes of Miller's Title VII and ADEA claims.

[3] In the complaint, Miller spells Deibert's name as both Deibert and Diebert. The Court uses the spelling that occurs most frequently. *Compare* ECF 9, ¶ 51, *with id.* ¶ 99.

discussed personal topics: "mental illness and substance abuse issues of ex-boyfriends and the like." *Id.* ¶¶ 66–69, 72. Deibert, Lane, and McIntyre "often whispered among themselves in the workplace," which made "others feel like outsiders." *Id.* ¶ 127.

During this same period, another employee, Matt Pierson, a white man who was then in his thirties, developed a personal relationship with McIntyre. *Id.* ¶ 70–71. The three women accepted him into their social circle. *Id.* Sometimes, however, conflict arose. *Id.* ¶ 72. Miller alleges that another employee once observed Pierson "stomping over to Ms. Deibert's cubicle and entering it, standing over her and, in a loud voice, peppering her with angry questions and accusing her of not having done something properly." *Id.* Despite Pierson's conduct, none of the younger women filed complaints with management about Pierson's behavior, and he "continued working at NASA well after Mr. Miller was terminated." *Id.*

Miller reports that he continued to interact with Deibert, Lane, and McIntyre "in a professional manner and treated them respectfully as with all his co-workers." *Id.* ¶ 73. Nevertheless, around this time, Deibert, Lane, and McIntyre began to perceive his "communications and conduct . . . as sexually harassing," which relegated "him to being a creepy old man." *Id.* ¶ 73. Miller alleges that the mood shifted because Miller's age was a "problematic trait." *Id.* For example, Miller alleges that in mid-2018, Lane and Deibert were "spreading rumors" that Miller was "hovering," "standing too close" to them, and talking to them about topics inappropriate for the workplace. *Id.* ¶ 75. Ultimately, Lane and Deibert informed Miller's supervisor, Robin Dixon, a Black woman then in her sixties who served as the Supervisory Librarian at NASA Goddard, that Miller made them "uncomfortable." *Id.* ¶¶ 76–80. Miller alleges that Dixon—"propelled by her own bias against older white males"—decided to report Miller's conduct to NASA's Protective Services Division. *Id.* ¶ 80.

As a result of Lane and Deibert's report to Dixon and Dixon's report to Protective Services, Miller was placed on administrative leave in September 2018 while Protective Services investigated the allegations. *Id.* ¶ 81. In the end, an investigator cleared Miller of "violating any Agency policy," found that Miller "had not sexually harassed or otherwise harassed" Deibert, Lane, or McIntyre, and concluded that Miller could "resume his normal work duties without any restrictions." *Id.* ¶¶ 82–83.

Despite that exoneration, Dixon barred Miller from social interactions with other employees except for pre-planned social events and informed him that he would need to secure permission to discuss work matters with his colleagues. *Id.* ¶¶ 85–86. Miller alleges these restrictions were called "Robin's Rules," were applied to him alone, and that all employees were aware of them. *Id.* ¶¶ 87–88. Miller subjectively experienced these restrictions as "a daily hell" and describes them as "draconian," "onerous," and a "Scarlet Letter." *Id.* ¶¶ 89, 94, 95. He also alleges that the restrictions created an environment where he was "categorized as a misogynist, predator and/or serial harasser" and that he was "seen as a pariah" and "deeply humiliat[ed] and embarrass[ed]." *Id.* ¶¶ 94–97. From then on, when Deibert, Lane, or McIntyre saw Miller in the workplace, they would "pivot and run away." *Id.* ¶ 97. Miller does not allege that anyone made any comments or statements to him because of Dixon's restrictions, but he alleges he was subjected to "scorn, disdain, mockery, and mistreatment" and a "harassing atmosphere and culture." *Id.* ¶¶ 94–95.

By Miller's own account, he did not abide by these restrictions. *Id.* ¶¶ 98–107. In fact, he admits he spoke with the Deibert and Lane on multiple occasions. *Id.* Miller offered to help Deibert and Lane take down Halloween decorations, *id.* ¶ 99, offered Lane help moving heavy boxes, *id.* ¶ 100, offered Deibert an extra "Dunkin Donuts coupon [Miller] had for a cup of coffee," *id.* ¶ 100,

and at the initiation of Patrick Healy, a white man over 50 years old, Miller joined a conversation between Lane and Healy about Lane's Fitbit smart watch, *id.* ¶¶ 57, 104–106. Deibert and Lane reported these incidents to Dixon, who reported them to Zimmerman & Associates, the contractor that employed Miller at the time. *Id.* ¶ 102. As a result of these incidents, Miller faced "various investigations," and Miller's contractual employer provided him with "'sexual harassment' training that was above and beyond" the ordinary training. *Id.* ¶ 109–10.

Miller alleges that these events culminated in Dixon "demand[ing]" that Miller be "physically transferred and moved from the main library building where he worked for nearly ten years as a Library Systems Administrator to a different building on the GSFC campus that was more than a mile away." *Id.* ¶ 111. This transfer "complicated and interfered with his ability to perform the functions of his systems administrator position." *Id.* ¶ 112. In addition, Dixon mandated that Miller be escorted whenever he "was required to be present in the main library building." *Id.* ¶ 113. These restrictions, Miller alleges, resulted in Miller being "shunned, ostracized, and bad-mouthed by these female employees" and created an environment where "his every communication with others [was] scrutinized, where he was met with scowls by other employees, where he was not included in workplace communications, where he was excluded from regular workplace chatter, and where he was [] looked at with withering looks of disgust." *Id.* ¶ 114. Miller offers a lengthy list of alleged wrongs he had to endure:

> hyper-scrutiny of his work, being mocked, shunned, ostracized, and disparaged by younger female employees; being falsely accused of sexual harassment; being moved from the library building; being excluded from meetings and gatherings; being prohibited from speaking with co-workers; needing an escort to attend meeting or be present in the library building; being told he could not attend a baby shower where female employees would be present; being bad mouthed at a government/leadership retreat; receiving a lower performance appraisal than he merited; being disallowed from contacting or interacting with NASA female employees without a liaison present; being disparaged by NASA employees; being scowled at; having people run away from him when he approached them; being

subjected to multiple investigations; being monitored in his movements and communications every time he was in the workplace; and being subjected to a differing standard of work rules.

*Id.* ¶ 144. At some point after November 13, 2019, Miller received a lower performance rating than he had previously—a development he attributes to Deibert, Lane, and McIntyre's allegations. *Id.* ¶¶ 124–26.

A few days before Miller was terminated, Deibert, Lane, and McIntyre "rush[ed] to meet together in the conference room where their gleeful exclamations could be heard in the office area." *Id.* ¶ 128. Their glee, Miller alleges, was because of his impending termination. *Id.* Miller claims that other workers he does not identify were concerned that "this clique of women was able to cause someone's termination by putting together a consistent campaign of complaints based on no factual basis." *Id.*

On February 28, 2020, Miller was terminated from his position at NASA Goddard, and he received a letter from LAC confirming his termination. *Id.* ¶¶ 129–31.

After Miller was terminated, Healy took over some of Miller's responsibilities. *Id.* ¶ 133. At some unspecified point afterwards, Dixon transferred some of those responsibilities from Healy to McIntyre, allegedly because McIntyre expressed a displeasure about Healy "having the responsibility for the archives." *Id.* ¶¶ 133–34. At some unspecified point after that, those responsibilities may have been transferred to a man named Pierce.[4] *Id.* ¶ 135.

From Miller's perspective, Dixon was significantly responsible for his termination, alleging that she "propelled and increased the discriminatory bias" of the younger female employees. *Id.* ¶ 136. According to Miller, Dixon "made unfounded statements about Mr. Miller to achieve her agenda of targeting Mr. Miller for his age, sex, and color" and "was so determined

---

[4] In the complaint, Miller does not identify who Pierce is and does not provide Pierce's race or an estimate of his age. *See* ECF 9, ¶¶ 133–35.

to destroy Mr. Miller that she had no qualms in making false statements, subject to penalty of perjury, in order to achieve her goals." *Id.* ¶¶ 136–38. Dixon's alleged bias is further reflected, Miller states, by her eventual removal of Healy from the archives, which Miller alleges is further evidence that "younger females were supported and the older males were targeted." *Id.* ¶ 140.

On April 10, 2020, Miller brought an informal complaint regarding his termination and the workplace environment to NASA's Office of Diversity and Equal Employment Opportunity. *Id.* ¶ 14. On June 1, Miller received a notice of his right to file a formal complaint. *Id.* ¶ 15. On June 14, he did just that, alleging that he experienced discrimination and harassment on the basis of his age, sex, and race. *Id.*

In the course of the ensuing administrative process, Dixon prepared an affidavit in question-and-answer format. *See* ECF 17-1; *see also* ECF 9, ¶ 141. In response to the question, "Did you consider or comment on the Complainant's protected bases (age, color, and/or sex)?", Dixon wrote

> I cannot answer this question as written. I have considered the Complainant's protected bases in considering that the Complainant only targeted and harassed younger (20 & 30's) white women in the workplace. He has never harassed any black women staff members, or any white women of authority or older than 30 something years old. From my perspective, the harassment complaints against the Complainant were because of their ages, color, and sex.

ECF 17-1, at 15.

After exhausting his administrative remedies, ECF 9, ¶¶ 16–28, Miller filed his complaint in this case, ECF 9. On June 16, 2023, Nelson moved to dismiss or, in the alternative, for summary judgment. ECF 12. Miller opposed the motion. ECF 15. Nelson replied. ECF 17.

## II.   Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir.

2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

## III.     Discussion

Miller fails to plausibly allege that he was fired because of his race or sex in violation of Title VII. He also fails to plausibly allege that he was fired because of his age in violation of the ADEA. And because he fails to plausibly allege that any of the conduct he found unwelcome was driven by his race, sex, or age, he fails to plead that he experienced a hostile work environment in violation of either statute.

### A.  Disparate Treatment – Title VII

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1). To survive a motion to dismiss a Title VII employment discrimination claim, a plaintiff must "allege facts to satisfy the elements of a cause of action created by that statute." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)), *cert. denied*, 141 S. Ct. 1376 (2021). For that reason, Miller "must allege facts sufficient to raise a plausible inference that his employer discharged him because of his race" or sex. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022); *McCleary-Evans*, 780 F.3d at 585.

Miller has not plausibly alleged he was terminated because of his race. Miller does not allege anyone ever made any statement whatsoever regarding the fact that he is white. His alleged accusers and the only male colleagues he identifies are white. His supervisor, Dixon, is Black, but that does nothing for Miller's case. He does not allege that Dixon ever made any statements about Miller's race. He does not allege specific facts indicating that she treated him differently than anyone of a different race. And every person Miller alleges took over any share of his

responsibilities after his termination was white. In short, Miller alleges no specific facts whatsoever from which the Court could plausibly infer that he was terminated because he is white.

Miller has not plausibly alleged that he was fired because of his sex either. Here, too, the complaint is largely bereft of specific factual allegations that would link his termination to the fact that he is a man. Miller does not allege that anyone disparaged him because of his sex. He does not allege that anyone disparaged men generally. He does not identify similarly situated women treated differently than he was. His immediate successor, Healy, was a man. His ultimate successor, Pierce, was a man as well.

Miller's allegations about Deibert, Lane, and McIntyre do not suggest animus based on sex. Miller insists that he only spoke with the three women about ordinary topics of conversation that were common in the workplace. *Id.* ¶¶ 104–06, 150. And by his account, he interacted with them "in a professional manner and treated them respectfully as with all his co-workers." *Id.* ¶ 73. From these facts, he asks the Court to infer that the only reason they would have complained about him was his sex (and, as discussed below, his age). However, the only plausible reading of Miller's own allegations is that the three women complained about him because his conduct made them uncomfortable—not because he is a man. For instance, Miller acknowledges that the women interacted with other men in the workplace without issue. *See id.* ¶¶ 68, 73.

Miller also attributes sex-based animus to Dixon. On Miller's account, Dixon exaggerated and supplemented the original complaints against him, treated him as though he were found guilty after he was found innocent, and then completed this campaign of sex discrimination by facilitating his termination. Miller alleges some specific facts in support of this claim. He alleges that after Deibert, Lane, and McIntyre complained, Dixon reported Miller to protective authorities and added that the complaints alleged *sexual* harassment, when in fact (says Miller) the female employees

had complained only of "harassment."[5] *Id.* ¶ 139. Miller also alleges that Dixon added an allegation that Miller "touched" one of the female employees when no such allegation was made. *Id.* Disregarding Miller's exoneration, Dixon imposed restrictions on Miller's ability to communicate with female coworkers. *Id.* ¶¶ 85–89. From there, when Miller interacted with his female co-workers innocuously but in violation of Robin's Rules, Dixon ratcheted up the restrictions, ultimately transferring Miller to another building and requiring him to be escorted around his original workplace. *Id.* ¶¶ 111–14, 117–20, 123. Then, because Dixon credited the young women's allegations notwithstanding the results of the investigation, Miller received a worse performance review than he earned. *Id.* ¶¶ 124–26. So eventually, NASA terminated Miller. *Id.* ¶¶ 128–29. The problem is that no specific facts in the complaint link Dixon's actions, however unreasonable, to Miller's sex. She may have treated him unfairly. She may have acted irresponsibly. She may have mischaracterized the allegations. But the inference that she did what Miller alleges because he is a man is barely more than speculative. Tellingly, Miller does not even attempt to identify a case where a court found comparable factual allegations sufficient to establish that the plaintiff was terminated based on sex.

To shore up his claims that he was fired on the basis of his race or sex, Miller highlights Dixon's statement in her affidavit during the administrative investigation that she "considered the Complainant's protected bases" in deciding to impose the restrictions on him. ECF 17-1, at 15.[6]

---

[5] The defendant argues that Dixon was obligated to escalate the complaints pursuant to NASA policy. This argument relies on facts not alleged in the complaint and documents that are neither incorporated in nor integral to the complaint. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). Therefore, the Court does not address this argument in ruling on the motion to dismiss.

[6] Miller quotes from Dixon's affidavit in his complaint. ECF 9, ¶ 141. Miller attaches some of Dixon's statement to his opposition. And Miller urges the Court to consider it. ECF 15, at 13. Nelson attached the full document to his reply. ECF 17-1. Because the affidavit is quoted in the complaint and its authenticity is not in dispute, the Court considers the document in its entirety in

In context, however, Dixon's affidavit does not support Miller's claim that he was terminated because of his protected traits. To be sure, Miller quotes Dixon's statement correctly. But Miller also quotes Dixon's statement selectively, leaving out the crucial second half of the sentence and the surrounding context. In the omitted portion, Dixon explains that she considered Miller's age, sex, and race "in considering that the Complainant only targeted and harassed younger (20 & 30's) white women in the workplace." *Id.* She continues: "He has never harassed any black women staff members, or any white women of authority or older than 30 something years old." *Id.* So while the document suggests that Dixon "considered" Miller's protected traits in identifying his pattern of workplace behavior, it does not signal that she took any action against him *because* of those traits. In fact, the document suggests Dixon acted because of Miller's *coworker's* protected traits.

Miller also tries to bolster his allegations of discriminatory animus by alluding to the treatment of comparators. By his account, he was "terminated for behavior that constituted mere normal communications in the workplace and was no different from the types of and manner of communication used by younger, female and/or non-white employees." ECF 9, ¶ 150. The court's analysis of whether a comparator is similarly situated "typically occurs in the context of establishing a prima facie case of discrimination, not at the 12(b)(6) stage." *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022) (quoting *Woods v. City of Greensboro*, 855 F.3d 639, 651 (4th Cir. 2017)). At the summary judgment stage, the bar is high: The plaintiff must prove that "the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all respects*.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, No. 21-2275, --- F.4th ---, 2024 WL 792270, at *4 (4th Cir. Feb. 27, 2024) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207–08 (4th Cir. 2019)).

---

ruling on the motion to dismiss. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Johnson v. Azar*, No. PWG-19-1859, 2020 WL 6544831, at *3 (D. Md. Nov. 6, 2020).

At the pleading stage, however, when a plaintiff relies on allegations about how comparators were treated compared to him to state a discrimination claim, the plaintiff need not identify a perfect comparator. *See Holloway*, 32 F.4th at 299; *Woods*, 855 F.3d at 650–51. Instead, the plaintiff need only "plead[] sufficient facts to justify an inference, plausibly and reasonably indulged," that the defendant treated them differently than the defendant treated others "under arguably similar circumstances," and that the defendant did so on account of the plaintiff's protected traits. *Woods*, 855 F.3d at 651.

Miller has not identified any comparator treated differently in "arguably similar circumstances," so his comparator analysis (such as it is) does not increase the plausibility of his inference of discriminatory animus. *See id.* For one thing, nowhere does Miller argue that the Court should compare his treatment to that of any specific individual comparator; rather, he makes sweeping, conclusory allegations, like his assertion that he "was held to a different standard than his younger and/or female and/or nonwhite co-workers." ECF 9, ¶ 150. For another thing, none of the individuals Miller identifies in the complaint—that is, the people the Court could possibly consider as comparators—was similarly situated to Miller. First, according to Miller's own allegations, the women complained about Miller's conduct and no one else's. That materially distinguishes Miller's conduct from that of his colleagues. It suggests that his conduct bothered the three women, whereas no comparator's conduct did. Second, there is no allegation that Dixon or Miller's employers knew about any misconduct by anyone else or that Dixon had any reason to impose Robin's Rules on anyone else. That further distinguishes Miller from any possible comparator. Third, whereas Miller alleges that he violated some of the rules governing his conduct in the workplace—Robin's Rules—he does not allege that anyone else violated any of the rules governing their workplace behavior. That distinguishes his position even further from the position

of any comparator. At most, Miller plausibly alleges that Deibert, Lane, and McIntyre found certain interactions with him uncomfortable even though they were okay with roughly similar interactions with other colleagues. *See, e.g.*, ECF 9, ¶¶ 66–69. But that is not enough to make it reasonable to infer that Miller was fired because of his race or sex.

To be clear, the Court does not require Miller to identify comparators at the motion to dismiss stage. The Court considers comparators only because Miller has offered them. Nor does the Court grant the motion to dismiss this claim because Miller has failed to identify someone identically situated to him who was treated differently than he was. Instead, the Court finds that Miller has not identified anyone sufficiently comparable to help make his claim of disparate treatment on the basis of his race or sex plausible.

In sum, Miller does not plausibly allege facts that give rise to a reasonable inference that he was terminated because of his race or sex. His Title VII discriminatory termination claim is dismissed.

### B.  Disparate Treatment – ADEA

Under the ADEA, "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (quoting 29 U.S.C. § 633a(a)). Therefore, an employer may not "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (quoting 29 U.S.C. § 623(a)(1)), *cert. denied sub nom. Liberty Univ., Inc. v. Bowes*, No. 23-703, 2024 WL 899230 (U.S. Mar. 4, 2024). To state a claim under the ADEA, a plaintiff must "allege facts to satisfy the elements of a cause of action created by that statute." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015); *see*

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–14 (2002). That is, the plaintiff must allege that he is "(1) over the age of 40, and (2) experienced discrimination by a federal employer (3) because of his age." *Song v. Becerra*, No. 20-1554, 2021 WL 3732961, at *1 (4th Cir. Aug. 24, 2021) (citing 29 U.S.C. § 633a(a)); *see also Tickles v. Johnson*, 805 F. App'x 204, 207 (4th Cir. 2020) (stating elements); *Kumar v. First Abu Dhabi Bank USA N.V.*, No. ELH-20-1497, 2020 WL 6703002, at *9 (D. Md. Nov. 13, 2020) (noting "ADEA liability hinges on discrimination '*because of . . . age*'" and dismissing ADEA claim for failure to allege that "younger employees were treated more favorably than plaintiff") (quoting 29 U.S.C. § 623(a)(1)) (emphasis in *Kumar*); *Babb v. Wilkie*, 589 U.S. 399, 408 (2020) ("[U]nder § 633a(a), age must be the but-for cause of differential treatment . . . .") (emphasis removed); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision."); *Kirby v. DeJoy*, No. JMC-22-2197, 2023 WL 6976069, at *5 n.7, *7 (D. Md. Oct. 23, 2023) (quoting *Song* and dismissing ADEA claim for failure to plausibly allege but-for causation); *Washington v. Balt. City Police Dep't*, No. LKG-22-2212, 2023 WL 6308090, at *6 (D. Md. Sept. 28, 2023) (dismissing ADEA disparate treatment claim because plaintiff did not plausibly allege that she was not promoted because of her employer's age bias) (citing *Gross*, 557 U.S. at 177–78).

Miller may state an ADEA claim by alleging direct evidence of employment discrimination or proceeding under the *McDonnell Douglas* burden-shifting framework, which begins with a *prima facie* case of employment discrimination. *Bing*, 959 F.3d at 616 n.8. While the plaintiff "need not plead a prima facie case of discrimination," the elements of a prima facie case may inform whether the plaintiff plausibly alleges an ADEA violation. *Id.* at 616 (quoting *Swierkiewicz*, 534 U.S. at 515); *see also Niner v. Garrett Cnty. Pub. Works*, No. ELH-17-2948, 2018 WL

3869748, at *16 (D. Md. Aug. 15, 2018) (noting "the elements of a prima facie case are a helpful guide in assessing the adequacy of the allegations"). The elements of a prima facie case of ADEA discriminatory termination are: (1) at the time of the employee's firing, he was at least 40 years of age; (2) he was qualified for the job and performing in accordance with his employer's legitimate expectations; (3) his employer nonetheless discharged him; and (4) his "position remained open or was filled by a similarly qualified applicant outside the protected class." *Palmer*, 72 F.4th at 67 (quoting *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006)). "[T]he Supreme Court [has] rejected strict adherence to the fourth element's requirement that the replacement come from outside the protected class in age discrimination cases." *Causey v. Balog*, 162 F.3d 795, 802 n.3 (4th Cir. 1998) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). The Court observed that "replacement by a substantially younger individual would provide a better indicator that the employer's decision was based on impermissible criterion." *Id.*; *see Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019).

The ADEA's high pleading standard and Miller's own allegations foreclose a plausible age discrimination claim. Miller does not allege any specific facts that would indicate that his age was the but-for cause of his termination, his distorted interpretation of Dixon's "protected bases" remark notwithstanding. Although he alleges in a conclusory fashion that he was ostracized because of his age, his specific allegations undermine that assertion. For example, even as Miller alleges that the three younger women excluded him and complained about his conduct because they found his age "a problematic trait," *see* ECF 9, ¶ 73, he also alleges that McIntyre confided in Healy, a comparably older man, about her discomfort with Miller's behavior, *see id.* ¶ 78. While Miller alleges that McIntyre later turned against Healy and asked Dixon to assign him different responsibilities—events Miller strains in briefing to portray as driven by Healy's age, *see* ECF 15,

at 18—Miller never actually alleges in the complaint that McIntyre's subsequent hostility to Healy was motivated by Healy's age at all.

Then there are Miller's allegations concerning his replacement. While Miller does not allege what happened after he was terminated with precision, what little he does allege undermines the plausibility of his claim that he was terminated because of his age. When Miller left, it was Healy, who is over the age of 50, who "assume[d] some of Mr. Miller's responsibilities." *Id.* ¶ 133. Miller mentions no one else who assumed his former responsibilities at that time. And in briefing, Miller does not deny that Healy constituted his replacement. *See* ECF 15, at 29. So to the extent Miller has alleged anything at all about his replacement, Miller has alleged that he was replaced by someone who was not significantly younger than he is. This absence of factual allegations of overt age discrimination combined with the allegations of replacement by someone of a comparable age should be the end of the matter. *See Westmoreland*, 924 F.3d at 725.

Miller attempts to sidestep these fatal defects in his complaint by alleging that at some later point, Dixon stripped Healy of his responsibilities for the archives and then, at some still later point, assigned them to Pierce. ECF 9, ¶¶ 133–135. That allegation does not save Miller's claim. Miller does not state Pierce's age anywhere in the complaint. *See id.* As a result, he has not alleged that Pierce was significantly younger than he was. Even giving Miller the benefit of the doubt and construing "Pierce" as "Pierson," a man in his "mid to late thirties," *id.* ¶ 70, this fact would only barely increase the plausibility that discrimination prompted Miller's firing. In any event, Miller's claim would fall short for yet another reason: What matters is who replaced Miller himself, not who replaced the person who replaced Miller. *See Bryant v. Mayor & City Council of Baltimore*, No. MJM-21-545, 2023 WL 6307823, at *19 (D. Md. Sept. 28, 2023) (finding "[n]o evidence suggests that Defendant's termination of [plaintiff's] employment had anything to do with her age"

when "there does not appear to be any dispute that Plaintiff was replaced [by someone], who is older than Plaintiff"). The Court cannot trace the line of succession until it reaches some younger person hired for something like Miller's former role.

Perhaps Miller sees Pierson, a white man in his 30s, as a comparator. Whereas Miller alleges that he comported himself appropriately around the three younger women, Miller alleges that on one occasion, Pierson behaved disrespectfully and disruptively. Yet whereas the women excluded Miller from ordinary social interaction, they welcomed Pierson. Whereas the women complained about Miller's relatively innocuous behavior, they did not complain about Pierson's inappropriate behavior. And so while Pierson kept his job despite his outburst, Miller lost his job despite his decency.

There are at least four reasons Miller's allegations do not show that Pierson is sufficiently similar to help make Miller's age discrimination claim plausible. First, Miller never alleges that the three women found Pierson's behavior during the incident as uncomfortable as they found Miller's. In fact, Miller never alleges that the three women found Pierson's behavior uncomfortable at all. Second, even assuming that the three women did find Pierson's behavior uncomfortable, Pierson's conduct was work-related: Pierson came over to Deibert's cubicle to complain that she had not done some work properly. By contrast, Miller's interactions with the group concerned personal matters, not professional ones. As a result, they may have regarded Pierson's conduct as more appropriate for the workplace. Third, Pierson was in a romantic relationship with McIntyre, and the other women knew about it. That, too, might explain why they responded differently to his actions than to Miller's. Fourth, whereas Miller never alleges that Dixon knew about Pierson's behavior towards the three women, Miller alleges that Dixon knew about his own. That distinction alone would make it unreasonable to infer that Dixon treated Miller

differently than Pierson because of Miller's age, rather than because she had reason to believe Miller had engaged in unprofessional behavior but had no reason to believe the same of Pierson. Even at the motion to dismiss stage, there are too many material differences between Miller's situation and Pierson's for any comparison between the two to advance Miller's claim that he was treated differently because of his age. *See Woods*, 855 F.3d at 650–51.

Miller has not plausibly alleged that he would not have been terminated but for his age. So his ADEA claim must be dismissed. *See Westmoreland*, 924 F.3d at 731.

### C.  Hostile Work Environment – Title VII and ADEA

Miller also claims that he suffered a hostile work environment. To state a claim for hostile work environment under Title VII or the ADEA, a plaintiff must allege "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected trait]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)) (internal quotation marks omitted); *see also Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006) (considering hostile work environment claim under ADEA) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764–65 (4th Cir. 2003)). "[H]arassment due to personality conflicts will not suffice." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

Like Miller's wrongful termination claims, Miller's hostile work environment claims fail because he has not plausibly alleged that any unwelcome conduct he experienced was based on his race, sex, or age.

Begin with the conduct of Deibert, Lane, and McIntyre. Even when read in the light most favorable to Miller, the allegations indicate that they were motivated by their discomfort with

Miller's speech and behavior and by their perceptions that it was inappropriate. Although Miller alleges "their dislike of him" was because he was "an older white male," he offers no specific facts in support of this conclusory allegation. *See* ECF 9, ¶ 101. He does not allege the young women made inappropriate comments about his age, sex, or race. *Cf. E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 324 (4th Cir. 2010) (defendant made off-color sexual jokes and used offensive terms towards female employees and clients); *Sunbelt Rentals*, 521 F.3d 306, 316–17 (4th Cir. 2008) (plaintiff was called religiously-offensive names and targeted with religiously offensive-comments); *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175–76 (4th Cir. 2009) (plaintiff called racial slurs); *Smith v. Potomac Elec. Power Co.*, No. TDC-19-1764, 2020 WL 1904707, at *2 (D. Md. Apr. 17, 2020) (plaintiff was told he was "on the last leg of the journey of life" and should "look into retirement"). Nor does he allege they told Dixon (or anyone else) that they did not like him because of his age, sex, or race. The only plausible inference the Court can draw from Miller's allegations is that the unwelcome conduct of the young women was motivated by their perception—whether reasonable or not—that Miller behaved and spoke inappropriately towards them, not because of his race, age, or sex.

Next, turn to Dixon's conduct. Miller highlights again his allegation that Dixon said that she considered his "protected bases" in imposing the restrictions. To Miller, this remark directly illustrates the discriminatory intent behind the conduct he found unwelcome. The Court has debunked this claim already. Miller's interpretation of Dixon's statement relies on quoting only half of it, out of context. Quoted in full, in context, Dixon did not say that she imposed the restrictions on Miller because he was white, a man, over 40, or based on any combination of these traits; instead, she said that in imposing the restrictions, she took account of the fact that she had received complaints about Miller's behavior towards young, white women only. So understood,

Dixon's statement does not give rise to a plausible inference that Dixon restricted Miller's workplace behavior because of his sex, race, or age.

In his opposition, Miller also argues he has plausibly alleged he was targeted because of his protected traits because his case presents "a factual scenario similar to" *Laurent-Workman v. Wormuth*, 54 F.4th 201 (4th Cir. 2022), in which the Fourth Circuit found a plaintiff had plausibly alleged racial discrimination. ECF 15, at 24. In that case, the plaintiff was a career civilian employee of the Army who sued alleging violations of Title VII for hostile work environment and retaliation. *Laurent-Workman*, 54 F.4th at 206–07. That is where the similarities to Miller's case end. Laurent-Workman was a black woman of Haitian descent. She alleged that her coworker (who was white) made racially hostile comments about her and to her. The co-worker said "'blacks cannot speak properly' and that she 'cannot understand them,'" "referred to African-American/Black soldiers as 'these people,'" and repeatedly called Laurent-Workman "you people." *Id.* at 207–08. Another coworker "communicated to a group of colleagues during a work event that black male athletes 'excel' in sports because 'the slave masters had bred the strongest slaves together.'" *Id.* at 208.

Miller alleges nothing close. Again, Miller identifies no hostile comments about him referring to his protected traits, language directed to him regarding his protected traits, or disparaging remarks about any protected class to which he belongs. And, again, there are many people in the workplace who share his protected traits. Nearly everyone he identifies was white, multiple co-workers were men, and there was at least one white man over the age of forty. Miller makes no specific factual allegations that any of these people experienced trait-based hostility.

At the end of the day, Miller's complaint alleges the sort of ordinary interpersonal conflict that is part of everyday life in American workplaces. *See Thorn v. Sebelius*, 766 F. Supp. 2d 585,

601 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012). From this ordinary conflict, Miller invites the Court to infer that much of the unwelcome conduct *must* have been because of his protected traits. *See, e.g.*, ECF 15, at 22 ("Mr. Miller became embroiled in a disparate workplace culture by a clique of younger women who carried animus against older men."). Miller's allegations that his coworkers' rude behavior was based on his protected traits are "simply too conclusory." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015). It is clear that some of Miller's colleagues did not get along with him, "but it is anything but clear that this unfortunate state of affairs had much to do with" his race, sex, or age. *See Ziskie*, 547 F.3d at 226. "[O]nly speculation can fill the gaps in [Miller's] complaint." *See McCleary-Evans*, 780 F.3d at 586. Without more, the Court cannot find that Miller has plausibly alleged that any of the allegedly hostile behavior he encountered transpired because of his protected traits. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (holding "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Because Miller has failed to plausibly allege that the actions he challenges were motivated by his race, sex, or age, he has failed to plead that he experienced a hostile work environment.

## IV. Conclusion

Miller has not plausibly alleged that he was fired because he is white, because he is a man, or because of his age. Nor has he plausibly alleged that he was subjected to a hostile work

environment. For these reasons, the defendant's motion to dismiss is granted and Miller's claims are dismissed without prejudice. A separate order follows.

Date: March 27, 2024

Deborah L. Boardman
United States District Judge